UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:  9/10/2020

LAWRENCE SCHWARTZWALD,

                        Plaintiff,

            v.

OATH INC.,

                        Defendant.

No.  19-CV-9938 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Lawrence Schwartzwald brings this action against Defendant Oath Inc., which owns and operates www.HuffPost.com, alleging copyright infringement in violation of Section 501 of the Copyright Act, 17 U.S.C. § 101 *et seq*.  Schwartzwald asserts that Oath unlawfully reproduced a photograph he took of the actor Jon Hamm (the "Photograph") without seeking his authorization or paying him a licensing fee.  The Photograph, which Schwartzwald alleges "illustrates what Jon Hamm looks like wearing trousers in public while he walks down the street, ostensibly without any underwear," Dkt. 15 ¶ 16, was subsequently included in altered form in a Huffington Post article entitled, *25 Things You Wish Your Hadn't Learned In 2013 And Must Forget in 2014*, *id*. ¶ 19 & Ex. B.  Now before the Court is Oath's motion to dismiss Schwartzwald's First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the Court agrees with Oath that its use of the Photograph is protected by the fair use doctrine.  Oath's motion is therefore granted.

## FACTUAL BACKGROUND

Except where otherwise noted, the following facts are drawn from Schwartzwald's FAC

and the exhibits attached thereto, and are assumed to be true for purposes of this motion.  *See*

*Myun–Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 65 (2d Cir. 2018).

Schwartzwald is a New York-based professional photographer who licenses his

photographs to online and print media for a fee.  FAC ¶¶ 1, 5.  Oath is a for-profit media

company that owns and operates the website www.HuffPost.com.  *Id*. ¶¶ 6-10.

Schwartzwald took the Photograph of the actor Jon Hamm walking down the street while

carrying a shopping bag and holding the hand of his then-girlfriend, the actress Jennifer

Westfeld.  *Id*. ¶ 11 & Ex. A; Dkt. 17 ("MTD") at 6.  Schwartzwald alleges that the Photograph

"illustrates what Jon Hamm looks like wearing trousers in public while he walks down the street,

ostensibly without any underwear."  *Id*. ¶ 16.  He further contends that he "took the Photograph

for the purpose of commercial news reporting."  *Id*. ¶ 14.



Schwartzwald licensed the Photograph to Splash News & Picture Agency, a New York-based stock photography agency that sub-licenses Schwartzwald's photographs to third-party media outlets.  *Id.* ¶ 12.  He also licensed it to the New York Daily News and other third-party media outlets "for the purpose of commercial news reporting."  *Id.* ¶¶ 13, 15.

On December 27, 2013, Oath ran an article on www.HuffPost.com entitled, *25 Things You Wish You Hadn't Learned in 2013 and Must Forget in 2014*.  *Id.* ¶ 19 & Ex. B.  The article begins:

> 2013 will be noted for a number of positive, enlightening and informative moments that took place across the cultural spectrum. People discovered, spoke truth to power and risked their lives to get information to the public. But there was also a poop cruise, outrage over butt-shaking and E-list celebrities clinging to fame by doing porn. You were alright, 2013, but we could have gone without learning …

*Id.* at Ex B.  The article proceeds to list 25 events or trends of 2013 that the authors "could have gone without learning."  *Id.*  Each event or trend is accompanied by a short paragraph of commentary; twelve are also accompanied by photographs.  *Id.*  Some of the items in the list—such as former New York congressman Anthony Weiner's explicit text messages—are salacious.  *Id.*  Others—such as the discovery that "[d]inosaur erotica is a thing that exists"—border on the absurd.  *Id.*  A few—such as the contention that "[p]eople freak out way more over TV deaths than they do over ones in the world we actually live in"—are darker.  *Id.*  A number of the items focus on viral moments involving celebrities, such as the assertion that "the nation flipped a collective shit" when pop star Miley Cyrus "twerked" at the MTV Video Music Awards.  *Id.*

At issue in this case is an item in the list entitled, "Some ad men don't do underwear."  *Id.*  The text below the heading reads:

> This year has been a busy one for "Mad Men" star Jon Hamm's privates. Apparently he's very blessed south of the border, and he, or those who examine photographs of him, really want you to know that. Hamm says he wants people to

3

stop talking about his loins, but it might help if he'd put on some underwear.

*Id.*  Following the text is a cropped version of the Photograph that excludes approximately half of the image, including the girlfriend with whom Hamm is walking (the "Oath Photograph").  *Id.* Superimposed over Hamm's groin area—the portion of the Photograph that allegedly "illustrates what Jon Hamm looks like wearing trousers . . . without any underwear"—is a black box containing the words "Image Loading" in white text.  *Id.* ¶ 16 & Ex B.



Oath did not license the Photograph from Schwartzwald, nor did it obtain his permission or consent to publish the Photograph.  *Id.* ¶ 24.  Schwartzwald registered the Photograph with the United States Copyright Office on May 18, 2017—more than three years after Oath published the article.[1]  *Id.* ¶ 18.  The Photograph was given the registration number VA 2-053-227.  *Id.*

---

[1] The FAC states that a copy of the registration is attached as Exhibit B and that Oath's article is attached as Exhibit

The registration states that the Photograph was first published on July 9, 2012.  Schwartzwald

alleges that he discovered Oath's article in April 2018.  *Id*. ¶ 25.

## PROCEDURAL HISTORY

Schwartzwald filed this action on October 28, 2019.  Dkt. 1.  After Oath filed a motion to

dismiss on December 20, 2019, Dkt. 9, Schwartzwald filed the FAC on January 10, 2020, Dkt.

15.  Oath filed the motion to dismiss the FAC now before the Court on January 24, 2020, arguing

that it did not infringe Schwartzwald's copyright because its use of the Photograph constitutes

fair use under copyright law.  Dkts. 16-17.  Schwartzwald filed a memorandum in opposition to

Oath's motion on February 7, 2020, Dkt. 18, to which Oath replied on February 14, 2020, Dkt.

19.  The Court held oral argument on July 7, 2020.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a

complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On

a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but

"whether his complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*,

562 U.S. 521, 529–30 (2011) (citation omitted).  In answering this question, the Court must

"accept[ ] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as

---

C.  *Id*.  Exhibit B to the FAC, however, is Oath's article, not the copyright registration, and there is no Exhibit C.
The Court nonetheless deems the copyright registration, which is publicly available at https://cocatalog.loc.gov,
incorporated into the FAC by reference.  *See BankUnited, N.A. v. Merritt Envtl. Consulting Corp.*, 360 F. Supp. 3d
172, 183 (S.D.N.Y. 2018) ("To be incorporated by reference, the complaint must make a clear, definite and
substantial reference to the documents.") (internal quotation marks and citations omitted).

factual allegations.'" *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

## DISCUSSION

Section 106 of the Copyright Act grants copyright holders "exclusive rights . . . to reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106. Yet "[f]rom the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8). While the origins of the fair use doctrine lie in the common law, it is now codified in Section 107 of the Copyright Act. *See id*. at 576 (1994) ("Congress meant § 107 to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way and intended that courts continue the common-law tradition of fair use adjudication.") (internal quotation marks and citations omitted). Section 107 permits the unauthorized use or reproduction of a copyrighted work if it is "for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research." 17 U.S.C. § 107. The statute lists four factors for "determining whether the use made of a work in any particular case is a fair use":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id*. "The task [of analyzing fair use] is not to be simplified with bright-line rules, for the statute,

like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577

(citations omitted); *see also Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) ("[T]he

determination of fair use is an open-ended and context-sensitive inquiry.").  "The ultimate test of

fair use . . . is whether the copyright law's goal of promoting the Progress of Science and useful

Arts would be better served by allowing the use than by preventing it." *Castle Rock Entm't, Inc.

v. Carol Publ'g Group*, 150 F.3d 132, 141 (2d Cir.1998) (internal quotation marks and citations

omitted).

"Fair use is an affirmative defense, and therefore Defendant bears the burden of showing

that a given use is fair." *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019)

(citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015)).  An affirmative defense

"may be adjudicated" on a motion to dismiss "where the facts necessary to establish the defense

are evident on the face of the complaint." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir.

2013) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).  Accordingly, when "the

only two pieces of evidence needed to decide the question of fair use" are "the original version"

and the allegedly infringing version, it is proper to decide the issue on a motion to dismiss.

*Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013).

Having considered each of the four fair use factors and weighed them together, the Court

finds that Oath's use of the Photograph constitutes a fair use.

## I.   Purpose and Character of the Use

"The first factor, 'purpose and character of use,' involves three sub-factors, which

involve determining whether the use is: (1) transformative; (2) for commercial purposes; or (3) in

bad faith." *Yang*, 405 F. Supp. 3d at 542 (citing *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477-

78 (2d Cir. 2004)).  The inquiry "may be guided by the examples given in the preamble to § 107,

looking to whether the use is for criticism, or comment, or news reporting, and the like."
*Campbell*, 510 U.S. at 578-79.  "The central purpose of this investigation is to see . . . whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."  *Id*. at 579 (internal quotation marks, citations, and brackets omitted).  Transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id*. (citations omitted); *see also Blanch*, 467 F.3d at 254.

### A.  Oath's Use of the Photograph Was Transformative

"[C]opying from an original for the purpose of criticism or commentary on the original or provision of information about it, tends most clearly to satisfy *Campbell*'s notion of the 'transformative' purpose involved in the analysis of Factor One."  *Authors Guild*, 804 F.3d at 215–16 (footnotes omitted); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) ("Courts often find such uses transformative by emphasizing the altered purpose or context of the work, as evidenced by surrounding commentary or criticism.") (citations omitted).  Thus, "[d]isplay of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story about that work." *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017).  For example, a "news report about a video that has gone viral on the Internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about."  *Id*. (citing *Konangataa v. Am. Broadcasting Companies, Inc.*, No. 16-CV-7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017)).  "Similarly, 'depiction of a controversial photograph' could be fair

8

use as accompaniment to commentary about the controversy or criticism of the photograph."
*Yang*, 405 F. Supp. 3d at 543 (quoting *Barcroft Media*, 297 F. Supp. 3d at 352).  "On the other
hand, if a photograph is merely used as an 'illustrative aid' that 'depict[s] the subjects described
in [an] article[ ],' it does not constitute transformative use."  *Id*. (quoting *Barcroft Media*, 297 F.
Supp. 3d at 352) (brackets in original).  That said, the copyright law "imposes no requirement
that a work comment on the original or its author in order to be considered transformative, and a
secondary work may constitute a fair use even if it serves some purpose other than those
(criticism, comment, news reporting, teaching, scholarship, and research) identified in the
preamble to the statute."  *Cariou*, 714 F.3d at 706.

Oath contends that its use of the Photograph was transformative because the
superimposed text box, photo caption, title, and broader context of the article fundamentally
transformed the character and purpose of the use.  *See* MTD at 10-14.  The Court agrees.  Unlike
the original Photograph, which Plaintiff claims had the objective purpose of "illustrat[ing] what
Jon Hamm looks like wearing trousers in public while he walks down the street, ostensibly
without any underwear," Oath's use of the Photograph served the dual purpose of mocking both
Hamm and those who found the Photograph newsworthy in the first instance.  The text box with
the words "IMAGE LOADING" in all caps—a play on words that alludes to both the nature of
digital technology and the body part at issue—suggests that Oath is making fun of Hamm, not
merely "illustrating" his appearance.  Moreover, as described above, the headline of Oath's
article—*25 Things You Wish You Hadn't Learned in 2013 and Must Forget in 2014*—makes
clear that the broader purpose of the article is to poke fun at events, trends, or topics that went
"viral" in 2013.  FAC at Ex. B.  The text immediately preceding the Photograph reinforces the
Court's conclusion that the article aims to mock the public fixation on Hamm's "privates" in

addition to mocking Hamm himself.  It states:

> This year has been a busy one for "Mad Men" star Jon Hamm's privates.
> Apparently he's very blessed south of the border, and he, or those who examine
> photographs of him, really want you to know that. Hamm says he wants people to
> stop talking about his loins, but it might help if he'd put on some underwear.

*Id*.  The caption thus twice references the public's focus on revealing photos of Hamm—first, by

describing "those who examine photographs of" Hamm, and second, by declaring that "Hamm

says he wants people to stop talking about his loins."  *Id*.  This caption, when viewed in the

context of the article's larger focus on viral moments, demonstrates that Oath used the

Photograph in part to mock the fact that the Photograph went viral to begin with.  The Court thus

concludes that the derivative use of the Photograph in Oath's article served two purposes that are

distinct from that served by the original Photograph.

Oath's use of the Photograph was also transformative because Oath modified the very

portion of the Photograph that made it most valuable or unique in the first instance.  As noted

above, Schwartzwald alleges that the Photograph "illustrates what Jon Hamm looks like wearing

trousers in public while he walks down the street, ostensibly without any underwear."  FAC ¶ 16.

By superimposing a text box over Hamm's groin area, Oath obscured the specific part of the

Photograph that allegedly reveals this fact.  A reader of Oath's article would thus not be able to

see the very thing the Photograph purportedly illustrates beneath the strategically-placed text

box—and what sets the Photograph apart from most other photographs of Hamm.  Accordingly,

unlike Schwartzwald's photograph, Oath's photograph is not "illustrat[ive]" of "what Jon Hamm

looks like wearing trousers in public while he walks down the street, ostensibly without any

underwear."  *Id.*   Rather, it seeks to conjure up this image in the reader's mind through the

comedic placement of the text box.

These distinctive features of Oath's use of the Photograph set this case apart from several others from this district in which courts have found that derivative uses of photographs were not transformed by modest alterations to the originals.  In *Graham v. Prince*, 265 F.Supp.3d 366 (S.D.N.Y. 2017), for example, the court held that a photograph was not transformed by the defendant's addition of an Instagram box.  Similarly, in *North Jersey Media Group, Inc. v. Jeanine Pirro & Fox News Network, LLC*, 74 F. Supp. 3d 605 (S.D.N.Y. 2015), the court held that a photograph was not transformed when the defendants superimposed the text "#neverforget" over an image of the twin towers from September 11th.  In contrast to the derivative uses of the photographs in *Graham* and *North Jersey Media Group*, however, Oath did not simply add a border, hashtag, or make another minor alteration to the Photograph.  Instead, as described above, it cropped approximately half of the image, superimposed a comedic text box over the key portion of the Photograph (Hamm's groin area), placed a witty caption above the Photograph, and placed it within the context of a larger article about "viral" moments or trends.

Oath's use of the Photograph is also distinct from the defendant media company's use of celebrity photographs in *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339 (S.D.N.Y. 2017).  There, the defendant used the plaintiffs' copyrighted photographs of celebrities in articles on the defendant's celebrity gossip websites.  For example, it used one photograph of the singer Selena Gomez "in a gallery of twenty-five images showcasing a 'risqué' fashion trend described by [the defendant] as 'Underbutt Fever.'"  *Id*. at 347.  It used another photograph of the actress Amanda Bynes in an article entitled, "'Amanda Bynes is Alive and Well in Mexico (and in a bikini) [Photos],' which commented on the actress's appearance and sought 'to demonstrate her improved health after a stint in rehab and turbulent behavior on

11

social media.'"  *Id*.  The court held:

> [The defendant's] use of the Images had no transformative effect because it
> displayed the Images in the same manner and for the same purpose as they were
> originally intended to be used. Paparazzi photographs . . . are designed to document
> the comings and goings of celebrities, illustrate their fashion and lifestyle choices,
> and accompany gossip and news articles about their lives . . . The purposes for
> which [the defendant] used the Images—to serve as banner images and thumbnails
> for "Daily Dumps" of celebrity news . . . ; to accompany articles about celebrity
> gossip and human interest stories . . . ; and to be included in roundups of celebrity
> fashion trends . . . are all consistent with the original intent behind taking and
> copyrighting the Images.

*Id*. at 351-52 (internal citations omitted).  The court found that the defendant did not use the

copyrighted photographs "to illustrate criticism, commentary, or a news story *about*" the

photographs, in the way that a "news report about a video that has gone viral on the Internet

might fairly display a screenshot or clip from that video to illustrate what all the fuss is about."

*Id*. at 352 (citations omitted) (emphasis in original).  Instead, the court held, the defendant "used

the Images as illustrative aids because they depicted the subjects described in its articles."  *Id*.  If

Oath had used the Photograph simply as an illustrative aid in a celebrity gossip story—for

example, by publishing an article focused on the relationship between Hamm and his then-

girlfriend—it would likely not be entitled to a fair use defense.  Yet, as described above, Oath's

article was not a typical celebrity gossip story, but instead was intended to be a comedic

compilation of and commentary about viral moments or trends from 2013, including the viral

Photograph of Hamm.

    The use of the Photograph here is more akin to the defendant media company's use of a

photograph of the financier Dan Rochkind and his girlfriend in *Yang v. Mic Network*, 405 F.

Supp. 3d 537.  The photograph in *Yang* initially appeared in a New York Post article entitled

*Why I Don't Date Hot Women Anymore*.  The defendant media organization published an article

entitled, *Twitter is skewering the 'New York Post' for a piece on why a man "won't date hot women"* that featured a screenshot of the New York Post article—including a portion of the photograph of Rochkind—as well as a series of embedded tweets that mocked both the Post article and Rochkind himself.  The court noted that the tweets embedded in defendant's article "not only poke[] fun at Rochkind as he is depicted in the Photograph, but also the idea that his opinions on 'hot women' would be reported seriously in the way that the Post has done."  *Id*. at 543-44.  The court thus found that the defendant's use of the article constituted fair use, as the article was "used 'to illustrate what all the fuss is about,' namely the Post Article and its depiction of Rochkind," which was "a different use of the Photograph than the Post's."  *Id*. at 544 (quoting *Barcroft Media*, 297 F. Supp. 3d at 352).  Here, too, the Photograph was "used to illustrate what all the fuss is about," namely Hamm's "privates" and the public's fixation with them, which is a different use of the Photograph than that intended by Schwartzwald.  *Id*.

Although the Oath Photograph arguably constitutes a parody of the original Photograph as well, this presents a closer question because "[p]arody needs to mimic [the] original to make its point."  *Campbell*, 510 U.S. at 580-81.  In light of the Court's holding that Oath's use of the Photograph was transformative for the reasons identified above, it need not reach Oath's alternative argument that the Oath Photograph is a parody of the original Photograph, *see* MTD at 15, nor Schwartzwald's response that the Oath Photograph cannot constitute a parody because it involves a "reproduction" of the original Photograph as opposed to a "recreation or imitation" thereof, *see* July 7, 2020 Tr. at 10:13-14.  In any event, in spite of his attempts to draw a distinction between reproductions of original works and recreations or imitations thereof in the context of parody, Schwartzwald appeared to concede at oral argument that courts can "find transformativeness out of an alteration of an image" outside of the context of parody.  *See id*. at

13

13:18-22.  Rightly so, as numerous Second Circuit cases have found secondary works transformative notwithstanding the fact that they contained modified reproductions of photographs.  *See e.g. Cariou*, 714 F.3d at 708 (holding that artworks of an "appropriation artist" who incorporated the plaintiff's copyrighted photographs into his work were transformative because they "have a different character, give [the plaintiff's] photographs a new expression, and employ new aesthetics with creative and communicative results distinct from [the plaintiff's]"); *Blanch*, 467 F.3d at 253 (holding that a Jeff Koons painting that was created, in part, through scanning the plaintiff's photograph into a computer and incorporating the scanned image into the painting was transformative because the "copyrighted work [was] used as raw material in the furtherance of distinct creative or communicative objectives") (internal quotation marks and citations omitted).  In short, while the Court need not opine on whether the Oath Photograph constitutes a parody, there should be no dispute that the fact that Oath reproduced the Photograph in modified form does not itself defeat a finding of fair use.

In sum, the Court finds Oath's use of the Photograph was transformative because it used the Photograph in service of its dual goals of mocking both Hamm and those who fixate over such suggestive photos of him—a use distinct from that which Schwartzwald intended—and because Oath obscured the very portion of the Photograph that made it most valuable or unique in the first instance.

### B.  Oath Used the Photo for Commercial Purposes

Schwartzwald alleges that Oath is a "for-profit entity" that "re-published the Photograph on its Website for the purpose of commercial news reporting."  FAC ¶¶ 10, 20.  While the Court expresses no view on whether Oath's article could fairly be characterized as "news reporting," it finds that Schwartzwald has plausibly alleged that Oath used the Photograph for commercial

14

purposes.  Oath does not appear to dispute that it is a for-profit entity, but rather contends that "this sub-factor should not weigh heavily on the Court's fair use determination."  MTD at 15.  Indeed, as described above, "if the new work is 'substantially transformative,' the 'other factors, including commercialism, are of less significance.'"  *Yang*, 405 F. Supp. 3d at 542-43 (quoting *Blanch v*, 467 F.3d at 254); *see also Cariou*, 714 F.3d at 708 ("This factor must be applied with caution because, as the Supreme Court has recognized, Congress 'could not have intended' a rule that commercial uses are presumptively unfair.") (quoting *Campbell*, 510 U.S. at 584).  Accordingly, the Court finds that this sub-factor counsels against a finding of fair use, but is not entitled to significant weight given that Oath's use of the Photograph was transformative.

### C.  Oath Did Not Engage in Bad Faith

As to the third sub-factor, the Court finds no plausible allegations of bad faith here.  The mere fact that Oath reproduced the Photograph without seeking Schwartzwald's authorization does not lead to a finding of bad faith, as the Second Circuit has noted that it is "aware of no controlling authority to the effect that the failure to seek permission for copying, in itself, constitutes bad faith."  *Blanch*, 467 F.3d at 256.  In any event, bad faith is not "itself conclusive of the fair use question, or even of the first factor."  *NXIVM Corp.*, 364 F.3d at 479.

In sum, the Court finds that two of the three sub-factors regarding the purpose and character of the use weigh in favor of a finding that Oath's use was fair, and that the only sub-factor that counsels against fair use is not entitled to significant weight.

## II.    The Nature of the Copyrighted Work

The second factor, the nature of the copyrighted work, "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Campbell*, 510

U.S. at 586.  The Second Circuit has identified two relevant sub-factors to be considered in this analysis: "(1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower."  *Blanch*, 467 F.3d at 256 (citation omitted).

As to the first sub-factor, the parties dispute whether the Photograph is a creative work or factual work.  Schwartzwald contends that "the Photograph is creative in nature as it is the product of a professional photographer.  Moreover, according to Plaintiff, in creating the Photograph, he exercised a personal and creative choice in the selection of camera equipment, wide angle lens, perspective, angle, lighting and exposure."  Opp. to MTD at 14.  Oath, by contrast, argues that the "Photograph is a more candid and factual 'point-and-shoot' image than posed or creative one," particularly because it was taken for the purportedly objective purpose of "reporting"—specifically, to "illustrate[] what Jon Hamm looks like wearing trousers in public while he walks down the street, ostensibly without any underwear."  MTD at 16-17 (quoting FAC ¶¶ 14, 16).

The Court agrees with Oath that the Photograph is more factual in nature than creative. The Photograph is a standard paparazzi-style photograph of a celebrity walking in public, and is thus similar to the photographs at issue in *Barcroft Media*.  As the *Barcroft Media* court noted:

> The photographers predominantly captured their subjects in public, as they naturally appeared, and were not tasked with directing the subjects, altering the backdrops, or otherwise doing much to impose creative force on the Images or infuse the Images with their own artistic vision. Although photography, including photography of a celebrity walking around in public, certainly involves skill and is not devoid of expressive merit, the Images are further from the core of copyright protections than creative or fictional works would be.

16

*Barcroft Media*, 297 F. Supp. 3d at 354 (S.D.N.Y. 2017).  Here, too, Schwartzwald appears to have captured Hamm and his female companion "as they naturally appeared" without altering their poses or staging their surrounding environment.  The photograph at issue in *Yang*, by contrast, was a posed photograph of Rochkind and his girlfriend.  The *Yang* court thus found that "it 'evince[d] at least a modicum of artfulness, sufficient to designate it a 'creative' (rather than 'factual') work for the purposes of fair use analysis.'" *Yang*, 405 F. Supp. 3d at 546 (quoting *Clark v. Transp. Alts., Inc.*, No. 18-cv-9985 (VM), 2019 WL 1448448, at *4 (S.D.N.Y. Mar. 18, 2019)).

The second sub-factor—whether the work is published or unpublished—also weighs in favor of Oath, as Schwartzwald's copyright registration, which was incorporated by reference into the FAC, states that the Photograph was first published on July 9, 2012.  *See supra* n.1. Accordingly, even drawing all available inferences in Schwartzwald's favor, the nature of the copyrighted work points towards a finding of fair use.

III.   **The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole**

The third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," also weighs in favor of a finding of fair use.  17 U.S.C. § 107. The relevant inquiry is "whether the quantity and value of the materials used[ ] are reasonable in relation to the purpose of the copying." *Cariou*, 714 F.3d at 710 (quoting *Blanch*, 467 F.3d at 257).  The law "does not require that the secondary artist may take no more than is necessary." *Id*.  Instead, the "secondary use 'must be [permitted] to conjure up *at least* enough of the original' to fulfill its transformative purpose." *Id*. (quoting *Campbell*, 510 U.S. at 588) (emphasis and brackets in original).

17

Here, contrary to Schwartzwald's claim that Oath reproduced the Photograph "with only minor cropping," Opp. to MTD at 14, Oath published approximately half of the Photograph. Oath's cropping eliminated Hamm's girlfriend from the Photograph entirely. Perhaps more important is the fact that Oath superimposed the text box over the very portion of the Photograph that Schwartzwald claims made it noteworthy in the first instance—Hamm's "privates". Oath's use thus contrasts with the defendant's use of the photograph of Selena Gomez in *Barcroft Media*, in which the defendant "did crop out some of the background of the photograph and portions of the singer's body, but it nonetheless focused on the portion of the Image most likely to grab viewers' attention and induce consumers of celebrity gossip and fashion trends to view the Image—namely, Gomez's 'risqué' fashion choice." *Barcroft Media*, 297 F. Supp. 3d at 354. Accordingly, it was "a reasonable use of the Photograph to achieve the purpose of both identifying the object of controversy and satirizing" Hamm and those who fixate on similar photos of him. *Yang*, 405 F. Supp. 3d at 547 (citing *Cariou*, 714 F.3d at 710).

Schwartzwald suggests that Oath could have pursued several alternatives, all of which he argues would have achieved its objectives without violating his copyright:

> (1) Oath could have commissioned its own photographer to photograph Hamm;
> (2) Oath could have published its news story without any photograph whatsoever;
> or (3) Oath could have obtained a license directly from Plaintiff before publishing
> its story.

Opp. to MTD at 15 n.7. The first or second proposed alternatives, however, would not employ a photograph of Hamm's "privates" that had already gone viral, and thus would not have accomplished Oath's goals of mocking both Hamm and those who obsess over viral photographs of this sort. As Oath put it, "[t]he fact that people were so interested in photographs of Jon Hamm in this context, such that they made 'news,' is precisely the subject on which the Article

is commenting." MTD at 12-13. Oath could not have communicated the same message without using the Photograph, or a similar photograph of Hamm's "privates" that had already "made news." *See Yang*, F. Supp. 3d at 546 ("Requiring Defendant to publish its news story without any photo whatsoever, would not be enough to achieve the transformative effect.") (internal quotation marks, citation, and brackets omitted). Schwartzwald's third proposed alternative— licensing the Photograph from Schwartzwald—is circular. While Oath could, of course, have sought a license from Schwartzwald to publish the Photograph, it was only legally obligated to do so if its use of the Photograph did not constitute fair use. Accordingly, the fact that Oath did not seek a license does not in itself defeat its fair use defense.

## IV.   The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work

The fourth and final factor, "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107, is "undoubtedly the single most important element of fair use," *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018) (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566 (1985)). "When a secondary use competes in the rightsholder's market as an effective substitute for the original, it impedes the purpose of copyright to incentivize new creative works by enabling their creators to profit from them." *Id.* This factor "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Id.* (citation omitted). "Factor four is necessarily intertwined with Factor One; the more the objective of secondary use differs from that of the original, the less likely it will supplant the commercial market for the original." *Id.* (citation omitted).

19

The fourth factor weighs in favor of a finding of fair use, as Oath's use of the Photograph is transformative and it is unlikely that any potential purchasers of the Photograph would opt for Oath's version instead of the original.  As noted above, Schwartzwald alleges that he licensed the photograph to third-party media outlets "for the purpose of commercial news reporting," as "the Photograph illustrates what Jon Hamm looks like wearing trousers in public while he walks down the street, ostensibly without any underwear."  quoting FAC ¶¶ 15-16.  The risk is low that any media outlet seeking to report on this fact would use Oath's photograph instead of Schwartzwald's, as the superimposed text box makes it impossible to ascertain "what Jon Hamm looks like . . . ostensibly without any underwear."  Oath's alterations to the Photograph render this case distinct from *Barcroft Media*, in which the court found that the defendant had failed to show "that the general audience for paparazzi and human-interest photographs would not be equally satisfied with its versions" of the relevant photographs.  297 F. Supp. 3d at 355.  Because Oath's use of the Photograph obscures its central feature, the secondary use does not constitute a "competing substitute for the original" and will not "deprive [Schwartzwald] of significant revenues."  *Capitol* Records, 910 F.3d at 662; *see also Yang*, 405 F. Supp. 3d at 548.

## V.    The Totality of the Factors

"The Supreme Court has instructed that, to ascertain whether there is fair use, all four of the statutory factors must be weighed together."  *Capitol Records*, 910 F.3d at 663 (citing *Campbell*, 510 U.S. at 577-78).  As described above, Oath's use of the Photograph was transformative, there is no plausible allegation of bad faith, the nature of the Photograph was more factual than creative, the Photograph was already published, the amount and substantiality of the original Photograph that Oath used was reasonable in relation to the purpose of the copying, and it is implausible that Oath's version of the Photograph will supplant the commercial

market for the original.  The only sub-factor that weighs against a finding of fair use is the fact

that Oath used the Photograph for commercial purposes.  Yet as described above, this factor

"must be applied with caution," *Cariou*, 714 F.3d at 708 (citation omitted), and is of "less

significance" in light of the transformative nature of Oath's use, *Yang*, 405 F. Supp. 3d at 542-43

(citation omitted).  Weighing the statutory factors together, the Court concludes that Oath's use

was fair as a matter of law.

<h3 align="center">CONCLUSION</h3>

For the foregoing reasons, the Court holds that Oath's use of the Photograph constituted

fair use and grants Oath's motion to dismiss.  As Schwartzwald already amended his Complaint

once in response to Oath's initial motion to dismiss and "in the absence of any indication that

[he] could—or would—provide additional allegations that might lead to a different result," the

First Amended Complaint is dismissed with prejudice.  *Gallop v. Cheney*, 642 F.3d 364, 369 (2d

Cir. 2011).  The Clerk of Court is respectfully directed to terminate the motions at Docket

Entries 9 and 16 and close this case.

SO ORDERED.

Dated:     September 10, 2020
           New York, New York

Ronnie Abrams
United States District Judge